1

2

3

4

5

6

7

8                     IN THE UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10    OSCAR W. JONES,

11              Plaintiff,                    No. CIV S-00-2811 GEB KJM P

12        vs.

13    LOU BLANAS, et al.,                     ORDER AND

14              Defendants.                   FINDINGS AND RECOMMENDATIONS

15    _____/

16              Plaintiff is a California civil detainee proceeding with an action for violation of

17    civil rights under 42 U.S.C. § 1983.  Plaintiff's claims concern the conditions of confinement

18    plaintiff experienced at the Sacramento County Jail between December 1997 and January 2000

19    while he was the subject of commitment proceedings under California's Sexually Violent

20    Predators Act (SVPA).  See Cal. Welf. & Inst. Code § 6600 et seq.[1]  The defendants still

21    remaining in this action are the County of Sacramento (County) and former Sacramento County

22    Sheriff Lou Blanas.  The parties' cross-motions for summary judgment are before the court.

23    Plaintiff seeks partial summary judgment against the County as to his Fourteenth Amendment

24    substantive due process claim.  Defendants seek summary judgment as to all of plaintiff's

25    _____

26        [1]  The SVPA has been amended several times since it was enacted in 1995, including by
      voter approval of an initiative on November 7, 2006.

1

1 remaining claims.  Oral argument was heard with respect to the parties' motions on December 5,

2 2007.

3 I.  <u>Summary Judgment Standard</u>

4         Summary judgment is appropriate when the moving party demonstrates there

5 exists "no genuine issue as to any material fact "and that the party is entitled to" a judgment as a

6 matter of law."  Fed. R. Civ. P. 56(c).

7         Under summary judgment practice, the moving party

8       always bears the initial responsibility of informing the district court
      of the basis for its motion, and identifying those portions of "the
9       pleadings, depositions, answers to interrogatories, and admissions
      on file, together with the affidavits, if any," which it believes
10       demonstrate the absence of a genuine issue of material fact.

11 <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  "[W]here the

12 nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary

13 judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers

14 to interrogatories, and admissions on file.'"  <u>Id.</u>  Indeed, summary judgment should be entered,

15 after adequate time for discovery and upon motion, against a party who fails to make a showing

16 sufficient to establish the existence of an element essential to that party's case, and on which that

17 party will bear the burden of proof at trial.  <u>See id.</u> at 322.  "[A] complete failure of proof

18 concerning an essential element of the nonmoving party's case necessarily renders all other facts

19 immaterial."  <u>Id.</u>  In such a circumstance, summary judgment should be granted, "so long as

20 whatever is before the district court demonstrates that the standard for entry of summary

21 judgment, as set forth in Rule 56(c), is satisfied."  <u>Id.</u> at 323.

22         If the moving party meets its initial responsibility, the burden then shifts to the

23 opposing party to establish that a genuine issue as to any material fact actually does exist.  <u>See</u>

24 <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).  In attempting to

25 establish the existence of this factual dispute, the opposing party may not rely upon the

26 allegations or denials of its pleadings but is required to tender evidence of specific facts in the

form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson, 477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken
/////

1    as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

2    'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

3    II.  Plaintiff's Motion For Summary Judgment (Docket Entry #144)

4            Plaintiff asserts he is entitled to summary judgment against the County with

5    respect to his claim that he was denied his right to substantive due process under the Fourteenth

6    Amendment while housed in the Sacramento County Jail, by being subjected to conditions of

7    confinement designed for a prisoner rather than a civil detainee.  See Compl. ¶¶ 52-53, 65-67

8    (4th and 10th causes of action).

9        A.  Background

10           In an order filed September 27, 2002, this court granted defendants summary

11   judgment on plaintiff's Fourteenth Amendment claim.  Approximately two years later, in Jones

12   v. Blanas, 393 F.3d 918 (9th Cir. 2004), the Ninth Circuit reversed.  In so doing, the Ninth

13   Circuit clarified the standard under which courts must analyze claims arising under the

14   Fourteenth Amendment brought by civil detainees challenging their conditions of confinement

15   during commitment proceedings:  a civil detainee awaiting adjudication is entitled to conditions

16   of confinement that are not punitive.  Id. at 933.  A restriction is punitive when it is intended to

17   punish or is excessive in relation to its non-punitive purpose, or is employed to achieve

18   objectives that could be accomplished "in so many alternative and less harsh methods."  Id. at

19   933-34.  A rebuttable presumption of punitive conditions arises when an individual is detained

20   under conditions identical to, similar to, or more restrictive than those under which pretrial

21   criminal detainees are held or where the individual is detained under conditions more restrictive

22   than those he or she would face upon civil commitment.  Id. at 934.

23           The Ninth Circuit found that because plaintiff was subjected to the same, and at

24   times the most restrictive, conditions when compared to the criminal inmates in the Sacramento

25   County Jail, a presumption exists that plaintiff was subjected to punitive conditions.  Id.  With

26   respect to the conditions he experienced while in general population, the Ninth Circuit

4

determined that plaintiff was entitled to "more considerate" treatment than criminal inmates, id.

(quoting Youngberg v. Romeo, 457 U.S. 307, 321-22 (1982)), and clarified that state law

"*demands* a 'less harsh method' of confinement for SVPA detainees: namely, holding them

separately from criminal detainees." Id. (citing Cal. Penal Code §§ 4001, 4002(a); emphasis in

original). The Ninth Circuit described the conditions to which plaintiff was subjected, during his

entire time at the jail, as follows:

> In total, [plaintiff] was incarcerated at the Sacramento County Jail
> from December 3, 1997, to January 4, 2000, a period of over two
> years. For roughly the first year of his time at the County Jail-from
> December 3, 1997, to December 9, 1998-[plaintiff] was housed
> with the general criminal population of the Jail. For [plaintiff's]
> remaining time at the Sacramento County Jail-from December 9,
> 1998, to January 4, 2000-he was housed in an administrative
> segregation unit known as "T-Sep." According to the declaration
> of a sheriff's deputy, this is not a disciplinary housing unit.
> However, in T-Sep [plaintiff] was subject to far more restrictive
> conditions than those afforded to the general jail population.
> [Plaintiff's] recreational activities were completely taken away, and
> he was allowed only one hour of exercise every other day. Phone
> calls and visiting privileges were considerably more limited in T-
> Sep. The time [plaintiff] was allowed out of his cell was reduced
> more than tenfold. [Plaintiff] was denied access to religious
> services. [Plaintiff's] law library access was considerably curtailed:
> while in T-Sep, [plaintiff] was denied physical access to the law
> library; he could request, by citation only, copies of cases no more
> than twenty pages long.
>
> Throughout his time at the Sacramento County Jail, [plaintiff] was
> subjected to numerous strip searches, some of which were
> conducted outdoors, and many of which were conducted at
> gunpoint in the middle of the night and accompanied by various
> intimidating tactics including poking with large weapons. On at
> least three occasions, Jones was led to the outside recreation area;
> forced at gunpoint to remove all clothing within the sight of many
> deputies (including female deputies); forced to lift his penis and
> testicles for inspection, run his fingers through his hair, then run
> his fingers inside his mouth; and forced to bend over, spread his
> buttocks apart with his hands, and cough three times.

Id. at 924. The Ninth Circuit remanded to allow defendants the opportunity to rebut the

presumption of a Fourteenth Amendment violation by "demonstrat[ing] legitimate, non punitive

/////

1   interests justifying the conditions of [plaintiff's] confinement and . . . show[ing] that the

2   restrictions imposed on [plaintiff] were not 'excessive' in relation to those interests." Id. at 935.

3       B. Whether Presumption Is Rebutted

4       In his motion, plaintiff argues defendants cannot rebut the presumption with

5   respect to plaintiff's time in either general population or T-Sep.[2]

6       1. General Population

7       In its opposition, the County does not seriously attempt to rebut the presumption

8   identified by the Ninth Circuit with respect to the time plaintiff served in general population.

9   The County does point out that during the first several days of plaintiff's residence at the

10  Sacramento County Jail, he was still serving out his criminal sentence. Opp'n at 4:14-21. The

11  County also offers evidence suggesting it was not aware of plaintiff's status as a civil detainee for

12  approximately one year after his criminal sentence expired, until shortly before plaintiff was

13  removed from general population. See Decl. of Deputy Kevin Farrell ("Farrell Decl.") ¶ 10

14  (docket entry # 141); see also Depo. of Kevin Farrell ("Farrell Depo.") at 110-113 & Ex. B.

15  Plaintiff on the other hand points to evidence the County was on notice of and even has admitted

16  knowledge of plaintiff's civil status. See Dec. 5, 2007 Letter from Pl.'s Counsel (docket entry

17  # 176), Ex. A at 2:23-29 (County's response to request for admission no. 2). To the extent the

18  County's knowledge of plaintiff's status is relevant, this is a question for the jury to resolve.

19      Regardless, the County admits that, at the time of plaintiff's admission to the jail

20  and during his entire time in general population, there was no policy for housing those committed

21  under the SVPA, Farrell Decl. ¶ 10; Declaration of Deputy Philip Daw ("Daw Decl.") ¶ 8; Decl.

22  Of Sgt. Roger Dillon ("Dillon Decl.") ¶ 9, although it also says it was aware of the requirement

23

24      [2] At oral argument, the County's counsel emphasized plaintiff's apparent satisfaction
        with his time in general population, given that he did not lodge complaints with the jail during
        his first year there. Given the claims on which plaintiff has been allowed to proceed in this court,
25      the presumption found by the Ninth Circuit applicable to the time in general population, and the
        totality of the record before the court, the court cannot find plaintiff has waived his Fourteenth
26      Amendment claim as to his time in general population.

1   that civil detainees be housed separately.  Dillon Decl. ¶ 3.  In light of the present record, the best

2   that can be inferred is that plaintiff was placed in general population either because his status as a

3   civil detainee did not register with those making his housing assignment, or due to the lack of a

4   clear policy, or both.

5            2.  T-Sep

6            With respect to plaintiff's assignment to "T-Sep" between December 9, 1998 and

7   January 4, 2000,[3] no party has provided a copy of a policy with respect to any of plaintiff's time

8   there.  The County concedes there still was no policy at the time of plaintiff's reassignment on

9   December 9, 1998, Dillon Decl. ¶ 9, and suggests the initial decision to place plaintiff in T-Sep

10  was intended to separate him and provide time to figure out what to do with him next.  Farrell

11  Decl. ¶ 10; Daw Decl. ¶ 8.  The County's arguments, however, appear to assume the placement at

12  some point was confirmed based on policy considerations.  For example, the County argues it

13  satisfies the rebuttal element of "legitimate nonpunitive interests" because plaintiff's

14  confinement in T-Sep was not intended as punitive, but rather was the most appropriate

15  assignment in light of policy considerations raised by plaintiff's prior convictions, which made

16  him both vulnerable to attack from jail inmates and also a potential threat to certain other

17  inmates.  See Opp'n at 6:17-25; Farrell Decl. ¶ 6; Daw Decl. ¶ 19; Dillon Decl. ¶¶ 4-8.

18           While sex offenders, including those held against their will under the SVPA, may

19  present unique security problems, the County fails to point to anything suggesting such problems

20  in this case required that this plaintiff be placed in near-isolation for over a year.  For example,

21  while a civil detainee might be more likely to be attacked, the County fails to point to anything

22  suggesting this fact alone increased the probability of attack on plaintiff in any significant respect

23  and certainly not to the extent justifying a policy resulting in all sex offenders, including plaintiff,

24

25           [3] Plaintiff's classification was changed to "civil" on May 1, 1999, even as he continued
    to be housed in T-Sep, although he was allowed a cell mate after May 1.  Depo. Of Oscar Jones
26  ("Jones Depo.") at 38:12-11; Farrell Decl. ¶ 11; Daw Decl. ¶ 9.

1  being placed in near-isolation.  Indeed, plaintiff's first year in general population without

2  incident suggests otherwise.

3          The County also argues that plaintiff's placement in "T-Sep" was necessary for

4  another legitimate, nonpunitive reason, namely the effective administration of the Sacramento

5  County Jail.  Opp'n at 7:2-9:6.  The County presents evidence, largely undisputed, on the total

6  number of cells at the jail, and the configuration of cells and housing units or "pods"; it also

7  notes the typically high occupancy rate and the corresponding unavailability of empty cells.  See

8  Farrell Decl. ¶¶ 15-21; Daw Decl. ¶¶ 12-18.  Given the high occupancy rate, and taking into

9  account security concerns, the County argues, it did not have the flexibility to provide plaintiff

10  with a preferential housing assignment.  This lack of flexibility, it says, explains the limits on

11  plaintiff's recreational activities and opportunities to exercise outside his cell, as well as on

12  phone calls and visiting, and law library access.  Opp'n at 8:8-20.  In other words, the County

13  asserts that the logistics of operating the Main Jail made the conditions to which plaintiff was

14  subjected in "T-Sep" necessary, once jail staff affirmatively factored his status into their housing

15  assignment determination.  Underlying this position is the County's unsupported assumption

16  that, because of his SVP status, plaintiff had to be kept in near-isolation from other persons

17  housed at the jail for his protection and the protection of others.

18          The County also suggests that plaintiff's placement in "T-Sep" was mandated by

19  the requirement under California law that civilly committed inmates be kept separate from

20  criminal inmates.  See Cal. Penal Code §§ 4001-4002.  The Ninth Circuit, however, has

21  determined that such a state mandate does not, by itself, trump plaintiff's Constitutional rights.

22  See Jones, 393 F.3d at 934-35.  In light of the law of this case, simply pointing to state law

23  without also providing a local policy explaining implementation of that law in the context of the

24  County's constitutional obligations is insufficient to overcome the presumption identified by the

25  Circuit.

26  /////

1   In sum, even if the County has pointed to some legitimate nonpunitive interests

2   justifying plaintiff's placement in T-Sep, it has not addressed in any meaningful way whether the

3   resulting restrictions imposed on plaintiff were or were not excessive in relation to those

4   interests.  In other words, the County has not established a genuine issue of material fact

5   requiring a jury's resolution as to whether it can rebut the presumption identified by the Ninth

6   Circuit.  As a matter of law, the conditions to which plaintiff was subjected in both general

7   population and "T-Sep" violated plaintiff's Fourteenth Amendment rights.

8   C. Monell

9   This conclusion does not end the analysis required by plaintiff's motion, however,

10   as the question remains whether the County is liable for the violations of plaintiff's rights

11   described above.  Under Monell v. Dep't of Social Servs., 436 U.S. 658, 694 (1978), a local

12   government is liable for damages under 42 U.S.C. § 1983 where a violation of constitutional

13   rights resulted from a policy or custom of that government.  Though "the touchstone of the

14   § 1983 action against a government body is an allegation that official policy is responsible for a

15   deprivation of rights protected by the Constitution, local governments. . . may be sued for

16   constitutional deprivations visited pursuant to governmental 'custom' even though such a custom

17   has not received formal approval. . ." Id. at 691.  The governmental entity will be liable if the

18   plaintiff can establish that the entity "had a deliberate policy, custom, or practice that was the

19   moving force behind the constitutional violation he suffered."  Whitaker v. Garcetti, 486 F.3d

20   572, 581 (9th Cir. 2007) (internal quotations, citations omitted).  The Ninth Circuit has defined a

21   municipal policy to exist when "a deliberate choice to follow a course of action is made from

22   among various alternatives by the official or officials responsible for establishing final policy

23   with respect to the subject matter in question."  Menotti v. City of Seattle, 409 F.3d 1113, 1147

24   (9th Cir. 2005) (plurality opinion).  A municipality's "lack of affirmative policies or procedures

25   to guide employees can amount to deliberate indifference, even when the county has other

26   general policies in place."  Long v. County of Los Angeles, 442 F.3d 1178, 1189 (9th Cir. 2006)

1  (reviewing cases including <u>Fairley v. Luman</u>, 281 F.3d 913, 918 (9th Cir. 2002) and <u>Oviatt v.</u>

2  <u>Pearce</u>, 954 F.2d 1470, 1478 (9th Cir. 1992)).

3     In this case, the Ninth Circuit has indicated plaintiff need not establish deliberate

4  indifference to prevail on his Fourteenth Amendment claims by virtue of the fact that he is a civil

5  detainee and not a criminal inmate.  Jones, 393 F.3d at 933.  However, this court does not read

6  this determination to extend to plaintiff's claims for monetary relief against the County or against

7  defendant Blanas in his capacity as ultimate supervisor over the Sacramento County Jail.  In the

8  case relied on by the Ninth Circuit, Oregon Advocacy Center v. Mink, 322 F.3d 1101 (9th Cir.

9  2003), state officials were sued in their official capacity for injunctive relief.  There does not

10  appear to be any authority for the proposition that a municipality or an individual sued as a

11  supervisor in a § 1983 action can be held liable for damages under the Fourteenth Amendment

12  for failing to establish a policy absent deliberate indifference.  Indeed, the Supreme Court has

13  found a municipality can be held liable for monetary damages for the analogous omission of

14  failure to train "only where the failure to train amounts to deliberate indifference to the rights of

15  persons with whom the police come into contact."  City of Canton, Ohio v. Harris, 489 U.S. 378,

16  388 & n.8 (1989) (deliberate indifference need not necessarily be shown to prevail on an

17  underlying constitutional claim brought by a civil detainee, such as for failure to provide medical

18  care, but deliberate indifference must be shown to extend liability to a municipality for failure to

19  train its employees).  Moreover, in a decision rendered by the Ninth Circuit after its 2004

20  decision in this case, the appellate court found that state officials could not be held liable for,

21  among other things, failing to take action with respect to conditions of confinement for persons

22  committed under the SVPA unless a plaintiff shows the failure to take action amounted to

23  deliberate indifference to the constitutional rights of the plaintiff.  Hydrick v. Hunter, 500 F.3d

24  978, 988 (9th Cir. 2007).  This court thus proceeds to a consideration of deliberate indifference in

25  applying Monell.

26  /////

1                    1.  <u>General Population</u>

2              As noted, plaintiff points to the County's admission in discovery that its

3    employees were aware, as of December 15, 1997, that plaintiff had served all of his criminal

4    sentence.  <u>See</u> December 5, 2007 Letter From Pl.'s Counsel (docket entry #176), Ex. A at 2:23-

5    29; <u>see also</u> Farrell Depo. at 110-113 & Ex. B.  While it appears the jail received a

6    communication dated December 15, 1997 from the California Correctional Center (CCC)

7    providing plaintiff's "parole release date of 12-14-97" with an instruction not to release plaintiff

8    "until SVP program" contacted, it is not clear who received the communication.  Farrell Depo. at

9    110-113 & Ex. B.[4]  Regarding the initial processing of plaintiff, as a general matter, the County

10   says the county employees who managed the intake and housing assignment aspects of plaintiff's

11   custody were following established procedures, albeit procedures for criminal inmates.  Farrell

12   Decl. ¶¶ 2, 4-5, 7-9.[5]

13             Even if the gaps in the current record could have been filled in by parties, the

14   record in its present form viewed in its entirety does not establish that, at the time of plaintiff's

15   release from his criminal term, the County clearly was aware of any duty on its part to adopt a

16   policy implementing appropriate civil commitment housing arrangements under the SVPA.  Thus

17   it cannot be said that the lack of a policy flowed from a conscious decision to not adopt a policy

18   /////

19

20             [4]  The County lodged an objection to the December 15, 1997 communication as
     unauthenticated.  Even if the communication were admitted, defendants argue there is no
21   evidence that someone actually received the notice.  Plaintiff responds that defendants'
     admission that one or more employees knew, on or about December 15, 1997, that plaintiff was
22   not a correctional inmate meets the authentication objection.  Because the request for admission
     was not tied to the actual document, however, defendants' objection is sustained without
23   prejudice.

24             [5]  The County concedes the jail had a policy and practice of reviewing an inmate's file
     after the first 60 days in custody.  Farrell Depo. at 82:8-21; <u>cf</u>. Decl. Of Jeffrey A. Minnery
25   (Minnery Decl.; docket # 166), Ex. K at 5 (Operations Order calling for review every 60 days).
     While it is reasonable to infer any review did not catch plaintiff's change to civil status any time
26   before December 1998, the current record is sufficiently unclear to eliminate a host of factual
     questions related to why plaintiff's status fell through the cracks, if indeed that is what happened.

1   as would be required for <u>Monell</u> liability to attach.  <u>Oviatt</u>, 954 F.2d at 1474, 1477.  Plaintiff's

2   counsel conceded as much at oral argument.

3          For the foregoing reasons, plaintiff cannot be granted summary judgment on the

4   <u>Monell</u> prong of his Fourteenth Amendment claim based on the period of time plaintiff was

5   housed in the jail's general population.

6          2.  <u>T-Sep</u>

7          With respect to plaintiff's being housed in "T-Sep," plaintiff offers testimony

8   from Deputy Sheriff Kevin Farrell in support of plaintiff's argument that he was placed in "T-

9   Sep" pursuant to a County policy:

10              Q.  And how did this - - did this classification further evolve from
                the time that you first learned about them?
11
                A.  Yeah.  When we first found out they were sexual violent
12              predators Civils, we had to - - we pulled them out of GP and we
                placed them up on eight east in what we call total separation status.
13              Each inmate had their own cell, stayed by their selves, because at
                that time we didn't know what we had.  This was like a brand new
14              classification for us and we didn't know what type of inmate we
                had at this time.
15
                Q.  And then what happened?
16
                A.  Don't know how it started, but I can give you a brief - -
17              somewhere we started asking - - going up our chain of command,
                probably through our sergeant.  He takes it to somewhere else.
18              Eventually, you know, going up to the captain and then going out
                even beyond that realm to I know where county counsel got
19              involved to try to find out what we had in our facility and how we
                were going to house them.
20

21   Farrell Depo. at 47:21-48:15.

22          The County argues that plaintiff at this stage has failed to satisfy his burden under

23   <u>Monell</u> of demonstrating the absence of a genuine issue of material fact as to the existence of a

24   policy, whether formal or ad hoc, and its serving as the "moving force" behind the violations

25   plaintiff allegedly suffered while in T-Sep.  The County is correct that Deputy Farrell's testimony

26   is not sufficient to meet plaintiff's burden on summary judgment.  Moreover, as previously

observed, nothing else in the record establishes the existence of a particular policy providing for plaintiff's placement in T-Sep, the content of such a policy, when it was adopted or by whom.

For the foregoing reasons, the court also will recommend that summary judgment be denied on the <u>Monell</u> prong of plaintiff's Fourteenth Amendment claim directed to his time in T-Sep.

III.  <u>Defendants' Motion For Summary Judgment (Docket Entry #137)</u>

Defendants County of Sacramento and Blanas seek summary judgment with respect to all of plaintiff's remaining claims, namely those alleging violations of his Fourteenth Amendment due process rights, his First Amendment rights of free expression, and Fourth Amendment protections against the unwarranted searches he says he experienced.

A.  <u>County of Sacramento</u>

1.  <u>Fourteenth Amendment</u>

All of the arguments raised by defendants concerning whether the County is entitled to summary judgment with respect to plaintiff's Fourteenth Amendment claims have been addressed above in the resolution of plaintiff's motion for summary judgment or by the Ninth Circuit in its opinion.  The County is not entitled to summary judgment with respect to plaintiff's Fourteenth Amendment claim.

2.  <u>Free Exercise</u>

In moving for summary judgment, defendants point to evidence they say demonstrates that plaintiff had the same access to religious services as other Sacramento County Jail residents.  <u>See</u> Defs.' Mem. P. & A. In Supp. Summ. J. (Defs.' Mot.) at 19:24-20:2 (referencing facts defendants say are undisputed).  Plaintiff presents evidence to the contrary, as described below, creating a question of fact for the jury to decide.

Specifically, in his complaint, signed under the penalty of perjury, plaintiff asserts that while he was in T-Sep he was denied the ability to attend religious services despite the fact that those housed in general population were given access to services.  Compl. at 10, 19.  In his

objections to the court's August 16, 2002 findings and recommendations, which also was signed

under the penalty of perjury, plaintiff indicates he is a Christian and that meeting with other

Christians is an important part of the practice of his religion:

> Religion is not a course or program in faith, religion is a process in
> faith, it never ends.  Without the benefit of communal services
> plaintiff was denied the uplifting of the spirit, the reassurance of
> fellow Christians that I am one with God, the we are saved by faith
> and not by deed.  Plaintiff was denied the communal praise of God.

September 19, 2002 Objections at 6:25-7:3.

In order for a prisoner to prove that his First Amendment right to free exercise of

his religion has been violated, he must show defendants burdened his practice of religion by

preventing him from engaging in conduct mandated by his faith without any justification

reasonably related to interests concerning the care of committed persons.  See Freeman v. Arpaio,

125 F.3d 732, 736 (1997) (citing Turner v. Safley, 482 U.S. 78, 89 (1987)).[6]  Several factors are

relevant in determining the reasonableness of the acts of correctional officials.  First, there must

be a valid and rational connection between the jail official's actions and the interest put forward

to justify those actions.  Turner, 482 U.S. at 89.  Second, the court must consider whether there

are alternate means of exercising the right impinged upon.  Id. at 90.  Third, the court must

consider the impact that accommodation of the asserted First Amendment right will have on

guards, other inmates, and correctional resources.  Id.  Finally, the absence of alternatives is

evidence of the reasonableness of the restriction imposed on the asserted First Amendment right.

Id.

The County argues plaintiff has not demonstrated he has been substantially

burdened in his practice of his religion.  Plaintiff's evidence, however, indicates group worship is

/////

---

[6] While the plaintiff in Freeman was a state prisoner, there is no case law in this circuit identifying a different standard for judging the free exercise claims of civil detainees as opposed to prisoners, there is no readily apparent reason for a different standard and neither party suggests that a different standard should apply, at least as a floor.

1   central to plaintiff's faith.  The County fails to point to anything suggesting plaintiff's statements

2   are not sincere and the court cannot make such a determination on the record before it.

3        The County argues further that plaintiff's access to the Bible study offered to

4   inmates in general population was prohibited because he needed to be kept separate from those

5   inmates.  As noted above, however, the County has not demonstrated as a matter of law that the

6   degree of isolation to which plaintiff was subjected, and which was responsible for his inability

7   to attend services, was necessary for his safety or the safety of anyone else.

8        The County's motion for summary judgment as to plaintiff's denial of his right to

9   free exercise of his religion should be denied.

10            3.  Fourth Amendment

11       Plaintiff claims he was subjected to unreasonable searches of his person while

12   housed at the Sacramento County Jail, in violation of the Fourth Amendment.  Compl. at 17.   At

13   oral argument, counsel for plaintiff clarified that plaintiff's Fourth Amendment claims are

14   limited to incidents in which plaintiff was ordered to submit to strip searches, including one

15   incident during which plaintiff was poked in the stomach with a gun.  In his complaint, plaintiff

16   specifically asserts that on three occasions he was awakened in the middle of the night, herded

17   with other inmates to an open area and forced at gunpoint to submit to full body cavity searches

18   while deputies, including female deputies, stood watch.  Compl. at 8-9.

19       Under the Fourth Amendment, all persons have the right to be free from

20   unreasonable searches of their person.  If a person has been searched while detained, the

21   "reasonableness" of a particular search is determined by reference to the context of the detention.

22   Hydrick, 500 F.3d at 993.  The "reasonableness" of a search is a fact-sensitive inquiry; strip

23   searches of civil detainees are not, per se, constitutionally acceptable.  Id. (even qualified

24   immunity will not protect a defendant from liability for arbitrary strip search of a civil detainee).

25       In its motion, the County does not argue that the particular searches of which

26   plaintiff  complains were "reasonable."  Rather, it argues generally that strip searches are

1 reasonable when conducted after an inmate or detainee has had contact with someone outside the

2 secure jail facility or has been moved about the facility. Defs.' Mot. at 23:3-24:9. The County

3 fails to demonstrate conclusively that the searches identified in the complaint were anything

4 other than random, based on a generalized policy. See, e.g., Daw Decl. ¶ 24. The County's

5 motion for summary judgment with respect to plaintiff's remaining Fourth Amendment claim

6 also should be denied.

7    B. Defendant Blanas Sued In His Official Capacity

8    Defendants assert Sheriff Blanas is entitled to summary judgment with respect to

9 all of plaintiff's claims against him in his official capacity because the County is entitled to

10 summary judgment; any suit against Blanas in his official capacity is the same as a suit against

11 the County. See Monell, 436 U.S. at 690 n.55 (official capacity suits are simply another way of

12 pleading an action against the employing entity); see also Kentucky v. Graham, 472 U.S. 159,

13 165-166 (1985). Plaintiff does not oppose this portion of defendants' motion for summary

14 judgment.

15    Because the county is not entitled to summary judgment, neither is defendant

16 Blanas. However, in light of the principle that any claim against Blanas in his official capacity is

17 the same as a claim against the county, there does not appear to be any purpose in having Blanas,

18 in his official capacity, remain as a defendant in this action. Therefore, the court will recommend

19 that plaintiff's official capacity claims against Blanas be dismissed.[7]

20    C. Defendant Blanas Sued In His Individual Capacity

21    Defendants urge that defendant Blanas in his individual capacity should be

22 granted summary judgment because he cannot personally be held liable for any of the violations

23 alleged in plaintiff's complaint. Specifically, they say, Blanas had no personal involvement in

24

25    [7] The court notes that defendant Blanas is no longer the Sheriff of Sacramento County. If
the official capacity claims were to survive, Sheriff John McGinness would be substituted as a
26 defendant under Federal Rule of Civil Procedure 25(d).

16

1  any of the alleged violations and, in a § 1983 action, supervisory officials cannot be held

2  vicariously liable for the actions of their subordinates.  See Hansen v. Black, 885 F.2d 642, 646

3  (9th Cir. 1989).  As plaintiff points out, a supervisor such as Sheriff Blanas can be held liable for

4  a violation of Constitutional rights even if he or she was not personally involved in the actions

5  leading to the violation if the supervisor implemented a policy so deficient that the policy itself is

6  a repudiation of Constitutional rights and is the "moving force" behind the Constitutional

7  violation.  Id.

8          Here, it is undisputed Blanas did not become Sheriff until January 4, 1999, after

9  plaintiff's transfer to T-Sep in December 1998.  Defs.' Reply to Pl.'s Statement of Disputed

10  Facts (docket entry # 170), No. 15; Depo. of Lou Blanas ("Blanas Depo.") at 7:18-19, 55:22-23.

11  While Blanas was the Undersheriff immediately prior to becoming Sheriff, he is not sued as

12  such.  Compl. ¶¶ 8-9.  He cannot be liable individually for anything that occurred before January

13  4, 1999.

14          Plaintiff already was housed in T-Sep at the time Blanas became Sheriff, and for

15  one year thereafter, until January 4, 2000.  With respect to this period of time, plaintiff argues, in

16  essence, that once he became Sheriff, Blanas should have adopted an appropriate policy

17  clarifying how to house plaintiff.  It is not disputed that Blanas had the authority to institute such

18  a policy if he so chose.  As noted, Blanas can only be liable for not having adopted a policy if by

19  not having a policy, he was deliberately, consciously indifferent to plaintiff's constitutional

20  rights.  Oviatt, 954 F.2d at 1477; Hydrick, 500 F.3d at 988.

21          In his deposition, Blanas himself agreed that the Sheriff has "ultimate authority

22  for management and policies and procedures at the jail."  Blanas Depo. at 24:11-14.  However,

23  he could not recall ever having approved a policy regarding housing of civil detainees held under

24  the SVPA.  Id. at 42:11-22, 43:5-8, 45:16-25, 58:21-59:12.  He also could not recall any details

25

26

of plaintiff's housing in particular, or the policies or practices applicable to him in T-Sep.[8]
Generally, Blanas said he relied on "the experts" to advise him regarding changes in the law and the resulting impact on jail management. Id. at 49:1-15.

By eliciting Blanas's agreement that he had full policy-making authority as Sheriff, plaintiff has identified sufficient evidence to survive summary judgment of this aspect of his case for the time period Blanas was Sheriff, however narrowly. Although the balance of Blanas's testimony does not begin to establish his conscious approval of, or decision not to approve, a policy with respect to housing of civil detainees such as plaintiff, Blanas's failure to recall any details at all also proves nothing for the purposes of summary judgment. See, e.g., Shawmut Bank, N.A. v. Kress Associates, 33 F.3d 1477, 1501 & n.24 (9th Cir. 1994). It is for the jury to evaluate the breach created by Sheriff Blanas's failure to recollect.

For these reasons, the court will recommend that defendant Blanas be granted summary judgment with respect to plaintiff's claims against him in his individual capacity arising before January 4, 1999, but denied as to those claims arising on and after January 4, 1999.

IV.  Miscellaneous

Plaintiff has filed his pretrial statement (docket entry #178). Plaintiff will be provided an opportunity to file an amended pretrial statement, if necessary, after the district judge assigned to this case issues his dispositive ruling on the parties' motions for summary judgment. Defendants will be required to file their pretrial statement after plaintiff files any amended statement.

Plaintiff also has filed a motion in limine (docket entry #179). If this matter proceeds to trial, the court will notify the parties of procedures concerning the filing of motions

---

[8] In an order dated April 18, 2008 in Cerniglia v. County of Sacramento, CIV-S-99-1938 JKS DAD P, the court commented that, for purposes of determining whether the County would be liable under Monell, it was undisputed by the parties that defendant Blanas made the final decision to put the plaintiff in that case in "T-Sep." Order at 16. Cerniglia is thus factually distinguishable from this case.

1    in limine in the court's pretrial order.  Plaintiff's motion will be denied at this time, without

2    prejudice to renewal after the court issues its pretrial order.

3            On November 21, 2007, plaintiff filed a motion asking that the court take judicial

4    notice of court documents filed in the Sacramento County Superior Court case of <u>Bull v. County</u>

5    <u>of Sacramento</u>, Case No. 01AS01545, and consider information contained in those documents as

6    facts supporting plaintiff's opposition to defendants' motion for summary judgment with respect

7    to plaintiff's Fourth Amendment claim.  <u>See</u> Request (docket entry #157).  Defendants object to

8    plaintiff's request on grounds that the proceedings in <u>Bull</u> do not have a direct relation to those in

9    this case.  Plaintiff concedes plaintiff was not a member of the class covered by <u>Bull</u>, and that, at

10    most, the strip searches it addressed were "similar" to those plaintiff alleges he experienced.

11    Request at 3:4-7.  Plaintiff's request for judicial notice will be denied.

12            Also on November 21, 2007, plaintiff filed objections to portions of certain

13    declarations submitted by defendants in support of their motion for summary judgment (docket

14    entry #160).  And in a separate filing, plaintiff asks that the court strike the declaration of Roger

15    Dillon (docket entry #153) submitted with defendants' opposition to plaintiff's motion for

16    summary judgment.  Plaintiff's objections and motion to strike go to the weight to be accorded

17    the declarations at this stage of the proceedings, and do not preclude the court's consideration of

18    them entirely.  Plaintiff's objections will be overruled and his motion to strike denied, without

19    prejudice.

20            In accordance with the above, IT IS HEREBY ORDERED that:

21            1.  Plaintiff's January 3, 2008 motion in limine (#179) is denied without prejudice

22    to renewal after the court issues its pretrial order.

23            2.  Plaintiff's November 21, 2007 request for judicial notice (#157) is denied.

24            3.  Plaintiff's November 28, 2007 motion to strike (#164) is denied.

25    /////

26    /////

IT IS HEREBY RECOMMENDED that:

1. Plaintiff's motion for summary judgment (#144) be granted in part and denied in part as follows:

    A. The jury at trial should be instructed that as a matter of law the conditions to which plaintiff was subjected in both general population and T-Sep at Sacramento County jail violated plaintiff's Fourteenth Amendment substantive due process rights; and

    B. Otherwise denied.

2. Defendants' motion for summary judgment (#136) be granted and denied as follows:

    A. Granted with respect to plaintiff's claims against defendant Blanas in his individual capacity arising before January 4, 1999;

    B. Denied with respect to plaintiff's claims against defendant Blanas in his individual capacity arising on and after January 4, 1999; and

    C. Denied as to plaintiff's claims against the County of Sacramento.

3. Any claims against defendant Blanas in his official capacity as the Sheriff of Sacramento County be dismissed.

4. Plaintiff be granted thirty days from the district court's resolution of the foregoing findings and recommendations to file an amended pretrial statement.

5. Defendants be granted thirty days from service of plaintiff's amended pretrial statement to file their pretrial statement.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within ten days after service of the objections. The parties are advised

that failure to file objections within the specified time may waive the right to appeal the District

Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED:  December 30, 2008.


_____
U.S. MAGISTRATE JUDGE

1
jone2811.57(new)